UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| GEORGE R. KILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:12-CV-629 |
| v. | ) | (VARLAN/SHIRLEY) |
| | ) | |
| THE DOW CHEMICAL COMPANY | ) | |
| LONG TERM DISABILITY PLAN; THE DOW | ) | |
| CHEMICAL COMPANY, *as Plan Administrator* | ) | |
| *and Plan Sponsor*; and | ) | |
| LIBERTY LIFE ASSURANCE COMPANY | ) | |
| OF BOSTON, *as Claims Administrator and* | ) | |
| *Fiduciary*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02. For the reasons stated herein, the undersigned will **RECOMMEND** that Plaintiff's Motion for Summary Judgment **[Doc. 33]** be **DENIED** and the Defendants' Motion for Judgment on the Administrative Record (ERISA) **[Doc. 31]** be **GRANTED**.

Plaintiff George R. Kiley brought this ERISA action against Defendants Dow Chemical Company and Liberty Life Assurance Company of Boston ("Defendants"), alleging that Defendants have failed to pay Plaintiff long-term disability payments due to him under The Dow Chemical Company Long Term Disability Plan ("the Plan"). Plaintiff alleges that the Defendants have violated the Employment Retirement Income Security Act of 1974 ("ERISA"), specifically § 502(a)(1)(B) of 29 U.S.C. § 1132(a)(1)(B), and prays for: a permanent injunction

enjoining the Defendants from illegal and unlawful policies and practices; past due benefits and prejudgment interest; attorneys' fees and costs; and other appropriate relief. [Doc. 15 at 7].

I.  BACKGROUND

The facts relevant to the parties' Motions for Judgment are as follows.

A.  **The History of Plaintiff's Claim**

The Plaintiff was employed by Rohm and Haas Chemicals, LLC from May of 2000 until May of 2011, and he became an employee of The Dow Chemical Company (hereinafter "Dow") when it purchased Defendant Rohm and Haas Company, LLC.

The Plan states, in pertinent part, that in order to be eligible for long-term disability benefits, an employee must meet the following definition of disability:

> **"Disability"** or **"Disabled"** means:
>
> (a) **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his regular occupation or any other occupation with the company for which the Covered Person is qualified and which is offered at not less than their current rate of pay; and
>
> (b) thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

Plaintiff's position at Dow in early 2010 was "Polymers Chemical Operator." In early 2010, Plaintiff applied for short-term disability benefits. Plaintiff's initial date of disability was determined by Liberty to be April 7, 2010. [R. 190]. Plaintiff received short-term disability benefits until April 2011. As required by the Plan, Plaintiff applied for Social Security Disability benefits in April, 2011. On December 15, 2012, the Social Security Administration determined

that Plaintiff was disabled under its rules as of April 6, 2010. On April 25, 2011, Liberty determined that Plaintiff was eligible to receive long-term disability benefits as of April 9, 2011. [R. 190]. Plaintiff began receiving long-term disability benefits under the Plan, starting with a check representing the benefits due to him from April 9, 2011, through May 8, 2011.

Thereafter, Plaintiff received a letter from Liberty dated December 5, 2011, stating that Liberty had completed a review of Plaintiff's eligibility and had determined that benefits would not be paid past December 5, 2011. [R. 48]. The letter noted that Plaintiff was originally approved for disability through April 8, 2013. [Id.]. However, the letter stated that, after collecting medical information from Plaintiff's physician and comparing these to the restrictions to the requirements of Plaintiff's occupation, Liberty found that Plaintiff no longer met the Policy's definition of disability. [R. 50].

Plaintiff appealed Liberty's decision on March 20, 2012 and included additional medical records from Dr. Phelps. [R. 32].[1] Liberty then referred the claim for a review by Meghan Stringer, a nurse case manager ("NCM") in its department of Managed Disability Services. On March 27, 2012, the NCM reported her findings that the medical record supported the previous decision to deny benefits. [R. 2]. On March 28, 2012, Liberty referred Plaintiff's file to its Appeal Review Unit. [Id.].

Liberty assigned employee Kim Murray, an appeals review consultant to review Mr. Kiley's file. On April 23, 2012, Ms. Murray, on behalf of Liberty, sent Plaintiff a letter stating that a review of his request for reconsideration had been completed, but Liberty was unable to alter its original decision to deny benefits beyond December 5, 2011. [Tr. 29]. Ms. Murray's findings are discussed more fully in the analysis below, but essentially, she found that the

---

[1] The information is incorrectly described as being notes from December 29, 2012. It appears that it is actually a note from a visit on December 29, 2011, because the letter describing the note is dated April 23, 2012.

3

"medical record does not provide any indication your physicians were imposing restrictions or limitations." [R. 32]. Ms. Murray explained, "In the absence of medical records to support impairment, you do not meet the definition of disability as noted above." [Id.].

On December 4, 2012, Plaintiff filed his Complaint for the wrongful discontinuation of his long term disability benefits. Plaintiff submits to the Court that, because has been disabled for more than twenty-four (24) months, the issue before the Court is whether he is unable to perform the materials and substantial duties of any occupation.[2]

**B.     Medical History**

Plaintiff's medical history includes diagnoses of generalized anxiety disorder, obsessive-compulsion disorder, positive human immunodeficiency virus (HIV) status, multiple recurrent basal cell and persistent squamous cell carcinomas, Dupuytren's contracture and weakness in his right hand, carpal tunnel syndrome, benign essential tremor, significant weight loss (over 50 pounds), lower motor neuron disease, and mild brain atrophy.

On February 15, 2010, Plaintiff had an office visit with Jennifer Green, a family nurse practitioner, at the office of Randolph M. Lowry, M.D., Plaintiff's primary care physician. [R. 221]. Plaintiff reported to Ms. Green that he had been working many hours, but he was not sleeping well. Ms. Green increased Mr. Kiley's diazepam prescription for anxiety symptoms and inability to rest.

On March 30, 2010, Plaintiff visited Anjuman Howlader, M.D., who was also associated with Dr. Lowry's practice. [R. 219]. Dr. Howlader noted that Plaintiff came for follow-up after a recent incident at work. Plaintiff reported that he was off of work and was planning to apply for

---

[2] The Court noted to Plaintiff's counsel at the hearing before the undersigned that Plaintiff's description of the issue before the Court appears to leave 4 to 5 months of the period of disability, due to Plaintiff's inability to perform the demands of his prior occupation, unaddressed. However, Plaintiff has not pursued a specific finding for this period in his papers or in his oral arguments, and the Court, therefore, declines to address this issue.

disability. Dr. Howlader noted that applying for disability might be appropriate "given the intensity of his current job." [R. 220]. However, Dr. Howlader indicated that the disability status would be related to Plaintiff's HIV, and thus, he thought the input of Dr. Jeffrey King, who followed Plaintiff's HIV, was needed.

On April 12, 2010, Plaintiff saw Matthew Wilks, a physician's assistant at Dermatology Associates of Knoxville, P.C., for his three month follow-up exam on the removal of a basal cell carcinoma of the left chest. [R. 249]. During that follow-up exam, Mr. Wilks found two new suspicious plaques on Plaintiff's left arm and took specimens for diagnosis. [Id.]. On the same day, Neil Coleman, M.D., of Knoxville Dermatology Laboratory, diagnosed the two tissue samples removed from Mr. Kiley's left arm as squamous cell carcinoma. [R. 250]. Mr. Wilks removed the two sites of squamous cell carcinoma from Plaintiff's left arm on May 20, 2010. [R. 247]. On July 9, 2010, Plaintiff presented to Edward Primka, M.D., of Dermatology Associates of Knoxville, for a Mohs surgery to his upper left arm. [R. 243]. At that time, Dr. Primka diagnosed Mr. Kiley with persistent squamous cell carcinoma. [Id.].

Also on April 12, 2010, Plaintiff had a follow-up visit with Ms. Green. Therein, Ms. Green stated that she saw Plaintiff on April 7, 2010, and had "placed him on leave from work secondary to anxiety and a pending culture for recurrence of squamous cell carcinoma." [R. 218]. On April 12, 2010, Plaintiff returned with FMLA papers for Ms. Green to complete.

On April 21, 2010, Plaintiff had an office appointment with Jeffrey King M.D., of Knoxville Infectious Disease Consultants, P.C. Dr. King noted that the Plaintiff had "a multitude of personal issues related to his employment and stress related to his employer['s] demands." Dr. King described Plaintiff's HIV as stable, and noted, "I doubt he would qualify for disability

on the grounds of HIV. He may on the grounds of other medical conditions, particularly if he has cervical disk disease with nerve impingement." [R. 253].

On May 3, 2010, Ms. Green saw Plaintiff and observed, "He continues to have a lot of problems with nerves, a lot of anxiety. He still is not able to do work. He seems to be slipping into a depression." [R. 217]. Ms. Green decided that Plaintiff should be kept off work at that time, but she noted, "I think it is imperative that we get a psychiatrist on board that will help us with underlying issues as well as recommend any medications that might assist us in symptom control. [Id.].

On May 17, 2010, Kenneth Carpenter, M.D., a board-certified psychiatrist, of Knoxville Psychiatric Group, diagnosed Plaintiff as having general anxiety disorder, with a global assessment of functioning score of 45 to 65. [R. 295]. Dr. Carpenter noted that Plaintiff reported he was not physically able to work in a warehouse anymore, his medical problems were related to his HIV positive status, and that he "get[s] excuse to be out of work." [R. 296].

On July 7, 2010, Ms. Green discussed Plaintiff's May, 17, 2010 visit to Dr. Carpenter, and that Dr. Carpenter had increased Plaintiff's valium prescription. [R. 216]. Ms. Green stated that she would keep him off work at that juncture. She noted that he felt "as though his anxiety is preventing him from working at [that] time." [Id.].

On July 21, 2010, Samuel Feaster, M.D., reviewed an MRI of Mr. Kiley's cervical spine, as ordered by Dr. Lowry, and noted, "Central disk protrusion at C6-C7. Bulging disc at C5-C-6." [R. 230].

On September 28, 2010, Dr. Lowry noted that a CT scan he had ordered on Plaintiff was normal except for a mild atrophy. [R. 215]. With regard to Plaintiff's work status, Dr. Lowry stated:

6

> Relative to his work situation I think there are three alternatives at this time.
>
> 1. He can go back to work with no limitations. I think this is probably not a practical approach and I think that both from an anxiety standpoint and a functional capacity this would not go well.
>
> 2. We could put him back to work with limitation of activity. He is not sure how limited activity would fit into his job description and he is hesitant about this.
>
> 3. We could extend his disability another ninety days.

[R. 215]. Plaintiff and Dr. Lowry elected to extend Plaintiff's period off of work for ninety days. However, Dr. Lowry noted, "I discussed with him though that at some point in time he is going to have to make a commitment as to whether he thinks he can try to go back to work or whether he wants to proceed with disability." [Id.].

On December 28, 2010, Dr. Lowry added Trazadone 50 m.g. to Plaintiff's medications and noted Plaintiff's ongoing issues with HIV, depression, insomnia, anxiety and chronic pain. [R. 214]. In notes from a visit on February 7, 2011, Dr. Lowry noted that Plaintiff had Dupuytren's contracture on the third finger of his right hand.

On February 15, 2011, Brantley Burns, M.D., diagnosed Plaintiff with Dupuytren's contracture, right hand, and weakness, right hand. [R. 228].

On March 8, 2011, Plaintiff returned to Dr. Lowry for follow-up from his visit with Dr. Burns and to address whether his Trazodone prescription was addressing his insomnia. [R. 233]. Plaintiff also complained of neuropathy, which Dr. Lowry thought could be related to some of his chronic problems and his HIV medications. Dr. Lowry also noted that Plaintiff was scheduled for follow-up with Dr. King. In closing, Dr. Lowry wrote, "He certainly, in my

opinion, remains disabled with HIV and other chronic problems and he intended to pursue the appropriate paperwork regarding this." [Id.].

Dr. Wiseman, a neurologist, first saw Plaintiff on April 7, 2011, for the purposes of consultation and evaluation of right upper extremity discomfort. [R. 151-153]. Upon examination, Dr. Wiseman concluded:

> 55-year old right-handed white male with chronic right upper extremity discomfort. The decreased strength in his hand may be related to the discomfort. The etiology of the discomfort is unclear. Whether this represents a neuropathic etiology or a musculoskeletal etiology or a combination therefore is unclear at this time.

[R 153]. Plaintiff returned to Dr. Wiseman on July 1, 2011, at which time Plaintiff continued to complain of right upper extremity discomfort and also a tremor affecting his hands. Dr. Wiseman found that testing revealed mild carpal tunnel syndrome on both sides and mild slowing of the left ulnar motor nerve across the elbow segment. He stated that his tremor was most consistent with benign essential tremor. [R. 148].

Richard Phelps, M.D., became Plaintiff's primary care physician following the retirement of Dr. Lowry. On June 27, 2011, Plaintiff saw Dr. Phelps for a follow-up visit. [R. 127]. The notes from this visit are largely illegible, but Dr. Phelps prescribed Zoloft and increased his Trazadone. In notes from a visit on December 29, 2011, Dr. Phelps noted: "Stays home & has to lie down several times a day. Prob. due to the HIV & the HIV meds. Unable to work due to fatigue. Has difficulty focusing & concentrating - unable to complete tasks." [R. 41].

**C.      Consulting and Reviewing Sources**

On April 6, 2011, A.E. Daniel, M.D., a consulting physician hired by Liberty, reviewed Plaintiff's medical records. Dr. Daniel is a licensed physician, with board certifications in adult general psychiatry, child and adolescent psychiatry, and forensic psychiatry. Dr. Daniel found

8

that the medical evidence supported a diagnosis of general anxiety disorder, with associated depressive disorder. [R. 203]. Dr. Daniel opined, "Reviewing the overall record including those of the attending physicians and from Dr. Carpenter, Mr. Kiley meets the diagnostic criteria for Generalized Anxiety Disorder including excessive worry and anxiety occurring more days than not for at least 6 months." [Id.]. Dr. Daniel further explained, "Assuming that he is currently or would get adequate psychiatric and medical treatment, the expected duration [of his condition] is another 6-9 months." [Id.].

On April 14, 2011, Dr. Daniel provided an addendum to his earlier report, which states:

> In my previous report, I may have implied that his physical diagnosis of HIV disease and other physical conditions may have caused some impairment; however, I am in no way opining that such conditions per se caused any impairment since such opinions are outside the scope of my specialty. Now, I am told that his treating physician has indicated that his HIV per se did not cause any impairment.
>
> From a psychiatric perspective, chronic medical conditions such as HIV Disease and chronic pain can and usually cause some degree of anxiety. His primary physicians have clearly indicated that he suffered from anxiety and depression as noted in the records entered by Dr. King dated 2/5/10, 4/12/10, 4/21/10 and 9/28/10 through 3/8/11. In fact he was formally diagnosed as having Generalized Anxiety Disorder by Dr. Carpenter on 5/17/10.
>
> It is to be noted that psychiatric symptoms form the basis of psychiatric based impairment. The response to Question in my report is revised as follows: "Based on the available medical records, Mr. Kiley has psychiatric impairment consisting of poor concentration, deficit in persistence and pace, low energy and problem with mood regulation caused by anxiety and depress, labile affect, obsessiveness and fatigue. These impairments have been evident since 4/10/10 through 3/11/11. The above-described impairment limits his functional occupationally.
> . . . .
>
> With regard to social impairment, my statement should read "available medical evidence does not support significant social impairment."

9

[R. 206].

On October 14, 2011, Peggy Geimer, M.D., a consulting physician who is board-certified in internal and preventive medicine, performed a Clinical Case Review of the non-psychiatric aspects of Plaintiff's condition for Liberty. [R. 109-112]. Dr. Geimer described the medical records provided by Plaintiff's medical providers and concluded that Plaintiff was not impaired by his diagnoses of HIV infection, mild bilateral carpal tunnel syndrome, benign essential tremor, Dupuytren's contracture, and recurrent basal cell and squamous cell carcinomas. [R. 109].

Liberty also engaged Dale E. Panzer, M.D., a board-certified, consulting psychiatrist, to conduct a peer review of Plaintiff's medical and psychiatric evidence. Dr. Panzer submitted a report to Liberty dated December 2, 2011, which detailed the records he had reviewed. Thereafter, he wrote his findings, which included the following:

> A diagnosis of anxiety disorder, NOS is supported by the medical evidence in this file. . . . I did not find that there was any other psychiatric or psychologic diagnosis supported in the clinical record.
>
> The claimant does have anxiety and worry. There is evidence in the clinical record that he did not like his work condition environment. Yet, per the claimant's own activities of daily living questionnaire, he is independent in essentially all functional activities. He does note driving is limited to 15 minutes. This may be related to fatigue, but this is not stated. There is also no indication that the claimant's anxiety condition is contributing to fatigue. The claimant acknowledges that medications may be causing some sedation. It is also quite common with HIV illness, as for any chronic medical condition, for an individual to complain of chronic fatigue without any psychiatric or psychologic disorder.
>
> There was no evidence in the clinical record of a psychotic condition, and the claimant is shown to be alert and oriented in all spheres. I did not find evidence that the claimant had any mood difficulty that was related to any suicidal ideation. . . . Due to the claimant's lack of documented evidence of his anxiety condition

> resulting in any physical/functional impairment, restrictions and limitations are not supported in this case.
>
> The claimant's treatment plan for his anxiety condition is inconsistent with a current standard of care. There was an isolated reference in the clinical record to the claimant taking an SSRI antidepressant. However, I did not find evidence of ongoing antidepressant intervention. . . . The claimant clearly has an emotional reaction to his work environment. It is recommended by one of his medical doctors early on that he talk about this difficulty. Yet, there is no evidence in the clinical record that the claimant has been involved in any form of counseling or psychotherapy. It is also inconsistent with a current standard of care for the claimant to have a reported impairing anxiety condition many months ago but to have no more than two visits with a psychiatrist to date. The claimant has also not seen a psychiatrist for approximately five months now. This is inconsistent with the reasonable standard of care, assuming the claimant had a functionally impairing psychiatric/psychologic condition.

[R. 64-65]. At the conclusion of his report, Dr. Panzer included a disclaimer, stating, "This report is not intended as a recommendation regarding any decision on a claim." [R. 66].

Liberty does not dispute Plaintiff's assertion that Liberty received a Walgreen's report for the period of October 28, 2010, to October 28, 2011, evidencing that a prescription for Sertraline – generic Zoloft, an SSRI antidepressant – had been filled by Plaintiff on August 2, 2011, August 31, 2011, and September 29, 2011. [See Doc. 34 at 12; Doc. 38 at 4].

## II. POSITIONS OF THE PARTIES

Plaintiff maintains that Liberty's decision to deny Plaintiff further long-term disability benefits was both arbitrary and capricious. In support of this position, Plaintiff argues that the treating and consulting physicians and psychiatrists all agreed that Plaintiff was correctly diagnosed with generalized anxiety disorder. Plaintiff maintains that both Dr. Carpenter and Dr.

Daniel were in agreement that Plaintiff was disabled by his depression and that Dr. Phelps observed that he was unable to work due to fatigue.

Plaintiff argues that Dr. Panzar erred when he found that the Plaintiff's records did not include a history of prescription use. Further, Plaintiff maintains that Liberty chose to accept Dr. Panzar's findings over the findings of other sources who found Plaintiff to be disabled. Plaintiff maintains that Liberty erred by not obtaining an in-person consultation or a "tie-breaker" opinion. Plaintiff contends that Liberty's decision was not rational or reasoned.

The Defendants argue that Liberty's decision that Plaintiff was not entitled to benefits under the Policy was reasoned and rational. In support of this position, Defendants cite the Court to Dr. Geimer's conclusion: "The claimant is not currently impaired by any of [his] diagnoses . . ." [R. 109], and Dr. Panzer's finding: "Due to the claimant's lack of documented evidence of his anxiety condition resulting in any physical/functional impairment, restrictions and limitations are not supported in this case." [R. 65]. Defendants maintain that the evidence from Plaintiff's own physicians was either inconclusive or inconsistent with the existence of a total, long-term disability. Defendants contend that its decision to give dispositive weight to the opinions of consulting physicians rather than treating physicians does not render the decision arbitrary or capricious. See Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).

### III.  STANDARD OF REVIEW

Where a benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's benefit determination is reviewed "under the highly deferential arbitrary and capricious standard of review." Goetz v. Greater Georgia Live Ins. Co., 649 F. Supp. 2d 802, 811 (E.D. Tenn. 2009)

(quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 168 (6th Cir. 2003) (internal quotation marks removed)).

If it is possible to offer a "reasoned explanation" for the decision, based on all the evidence known to the administrator, then the decision is not arbitrary and capricious. Hunter v. Caliber System, Inc., 220 F.3d 702 (6th Cir. 2000); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 169, 172 (6th Cir. 2003). Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008). In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir.2006).

Moreover, the Court is to limit its review to the administrative record. Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998); Wilkins v. Baptist Healthcare Sys., 150 F.3d 609, 613 (6th Cir. 1998).

## IV. ANALYSIS

In a letter dated April 23, 2012, Liberty, through Ms. Murray, its Appeal Review Consultant, explained that it would not alter its original determination denying the Plaintiff benefits beyond December 5, 2011. Therein, Liberty reviewed the definition of disability under the Policy and explained that it had requested and received medical records from Dr. Lowry,[3] Dr. Phelps, Dr. King, Dr. Carpenter, and Dr. Wiseman.

---

[3] Liberty uses the spelling "Lowery" throughout its discussion. The records before the Court indicate that the correct spelling is "Lowry," and the Court has, therefore, used this spelling.

Liberty explained that all of the medical evidence Plaintiff had submitted, prior to his appeal, had been reviewed by Dr. Geimer and by Dr. Panzer. [R. 30]. Liberty stated the conclusions of the investigation:

1. <u>Diagnosis</u>. Liberty found the medical evidence supported a diagnosis of anxiety disorder. However, it was noted that it is difficult to determine if Plaintiff's condition was secondary to his HIV illness. Notwithstanding, Liberty adopted Dr. Panzar's conclusion that the clinical record did not support any other psychiatric or psychologic diagnosis. [R. 30].

2. <u>Impairments</u>. Liberty acknowledged that the Plaintiff had anxiety and worry, but they also found evidence that the Plaintiff did not like his work environment. Liberty found that, with the exception of a reported driving limitation, he was "independent in essentially all functional activities." [R. 30].

3. <u>Treatment Plan</u>. Liberty found that claimant's treatment plan was not consistent with the current standard of care. Liberty based this finding upon: (1) the lack of evidence of ongoing antidepressant intervention; (2) the use of diazepam as a sleep aid; (3) the lack of counseling or psychotherapy. [R. 31].

Liberty addressed the Plaintiff's December 29, 2011,[4] visit with Dr. Phelps, but found that the assessment was benign and recommended continuation of Plaintiff's treatment regimen. [R. 32]. Liberty concluded, "There are no clinical findings or treatment changes that indicate impairing symptoms or an unstable condition." [<u>Id.</u>]. Finally, Liberty explained Plaintiff's right to appeal the decision including his "right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review." [<u>Id.</u>].

---

[4] The letter, which is dated April 23, 2012, incorrectly refers to this visit as taking place on December 29, 2012, rather than December 29, 2011.

14

In this case, the parties do not dispute that the arbitrary and capricious standard of review is applicable to the instant case. [Doc. 32 at 15; Doc. 34 at 13]. Thus, the Court turns to determining whether Liberty's decision was the result of a deliberate, principled reasoning process and whether it is supported by substantial evidence. Glenn, 461 F.3d at 666.

A.  *The Result of a Deliberate, Principled Reasoning Process*

First, the Court finds that the decision was the result of a deliberate, principled reasoning process. The Court finds that Liberty reviewed the relevant records including the most recent records from Plaintiff's visit with Dr. Phelps in December 2011. Liberty acknowledges that there was some confusion regarding its attempts to reach out to Dr. Lowry, who had apparently retired, and regarding the fact that Dr. Phelps had taken Plaintiff as a patient upon Lowry's retirement. This confusion, however, does not undermine the fact that Liberty reviewed the relevant office notes and medical tests and submitted the same records to a qualified physician and psychiatrist for review, and the Court finds the Plaintiff has not challenged the qualifications of either Dr. Panzar or Dr. Geimer.

Plaintiff alleges that Liberty erred in its procedure by accepting Dr. Panzar's findings over the findings of other sources who found Plaintiff to be disabled. The Court finds that the Plaintiff's physicians did not find psychological conditions that rendered Plaintiff disabled. The Court also finds that there is no basis for finding Liberty's decision should be remanded or overturned based upon its reliance upon consulting physicians.

The Court finds that the record does not indicate that the Plaintiff's physicians found him to be disabled. Instead, the Court finds that his primary physician Dr. Lowry and Ms. Green, his nurse practitioner, endorsed Plaintiff's decision to stay out of work for a period, but neither diagnosed specific psychological conditions nor limitations that prevented all work. Neither Dr.

15

Lowry nor Ms. Green evaluated Plaintiff's psychiatric abilities to determine if his mental functional capacity precluded him from working long term, and doing so would have arguably exceeded their expertise.

In his office visit notes from September 2010, Dr. Lowry indicated that Plaintiff could go back to work at his previous position, though there might be some problems with doing so, but Dr. Lowry indicated that Plaintiff could work in other positions under appropriate limitations. The only time Dr. Lowry indicated long-term disability was related to Plaintiff's HIV. This diagnosis is undercut by the findings of Dr. King, who treated Plaintiff's HIV. Moreover, in the instant case, Plaintiff argues that he is disabled due to his psychological conditions not his HIV.

Ms. Green indicated that she placed Plaintiff on leave "secondary to anxiety and a pending culture for recurrence of squamous cell carcinoma." However, the Plaintiff does not argue in the instant suit that he is disabled due to the carcinoma, and with regard to the anxiety, the Court, again, finds that this statement does not explain what impairments or symptoms of Plaintiff's condition preclude work. Moreover, the findings of Ms. Green, as a nurse practitioner, are undermined by those of Dr. Lowry, Dr. King, and Dr. Panzar.

Similarly, Dr. Phelps found that Plaintiff was unable to work due to fatigue and that he had difficulty focusing and concentrating. This diagnosis is a general statement based upon Plaintiff's subjective complaints. There is no indication that Dr. Phelps undertook objective testing to evaluate Plaintiff's fatigue or to determine Plaintiff's ability to concentrate, and again, doing so would have arguably exceeded the scope of Dr. Phelps's expertise at least with regard to the psychological conditions.

Finally, the Court finds that Dr. Carpenter, the only treating psychologist or psychiatrist in the record, did not find that the Plaintiff was disabled or diagnose limitations that would

support a finding that the Plaintiff was disabled under the Plan. Instead, Dr. Carpenter noted that Plaintiff reported he was not *physically* able to work in a warehouse anymore. Dr. Carpenter's reiteration of Plaintiff's subjective report about the demands of his particular position in the warehouse does not support a finding of disability, and Dr. Carpenter's note that Plaitniff "get[s] excuse to be out of work," [R. 296], certainly indicates that Dr. Carpenter himself did not adopt a view that Plaintiff was not mentally able to perform any type of work. Thus, the Court cannot find that Dr. Carpenter found Plaintiff to suffer from long-term mental impairments that supported a finding of disability.

Based upon the foregoing, the Court finds that the evidence from Plaintiff's treating physicians does not necessitate a finding that the Plaintiff was disabled within the Plan and does not undermined Defendants' position that a reasoned review was undertaken.

The Court finds that the Plaintiff has not directed the Court to any case law indicating that a decision under ERISA is arbitrary and capricious because the findings of a treating physician were not afforded weight in excess of the weight afforded to consulting physicians. To the contrary, counsel for the Plaintiff agreed at the hearing before the undersigned that there is not a "treating physician" rule in ERISA cases similar to the rule applied in Social Security disability cases. Moreover, such a rule would not be appropriately applied in the instant case where the consulting psychiatrist was more qualified to opine on Plaintiff's mental conditions than were his treating physician and nurse practitioner.

The Court has also considered Plaintiff's position that Liberty erred by not obtaining an in-person consultation or a "tie-breaker" opinion. The Court finds that this argument assumes that there was a "tie" to be broken. The treating-physician records before the Court, as stated above, do not support a diagnosis that the Plaintiff was disabled within the meaning of the Plan,

17

Case 3:12-cv-00629-TAV-CCS   Document 41   Filed 02/14/14   Page 17 of 20   PageID #: 616

based upon his psychological condition. Further, the Court finds that, while Dr. Daniel indicated the Plaintiff suffered from a psychological condition that could preclude work, his diagnosis was limited to a six to nine month period, with proper treatment, and he later retracted the opinion to the extent it was tied to Plaintiff's HIV. Thus, the Court finds that neither the findings of the treating physicians nor of Dr. Daniel directly conflict with the findings of Dr. Panzar and Dr. Geimer. Thus, there was no "tie" to be broken, and the Court finds that the Plaintiff has not cited the Court to any case law requiring a "tie-breaker" opinion in this case. Accordingly, the Court finds that the failure to obtain a "tie-breaker" opinion did not render the process unreasonable, and the Court finds this allegation of error is not well-taken.

Based upon the foregoing, the Court finds that Liberty's decision was the result of a deliberate, principled reasoning process.

B.  *Decision Supported by Substantial Evidence*

The Court turns next to the whether the decision is supported by substantial evidence. As an initial matter, the Court reincorporates its findings above – that is, the Court's finding that the records from Plaintiff's treatment do not support a finding of disability under the plan. Moreover, the Court finds that the consulting sources' opinions support a finding that the Plaintiff did not suffer from impairments that would fulfill the definition of disability under the Plan.

With regard to the substantive support for Liberty's decision, Plaintiff argues that the decision lacks substantive support because the decision relies heavily upon the findings of Dr. Panzar and Dr. Panzar allegedly erred in finding that the Plaintiff's records lacked a history of ongoing antidepressant use. The Court has reviewed the records from Walgreen's for October 28, 2010, to October 28, 2011, evidencing that a prescription for Sertraline – generic Zoloft, an

18

SSRI antidepressant – was filled by Plaintiff on August 2, 2011, August 31, 2011, and September 29, 2011. [R. 81]. The Court finds that the prescription records do not demonstrate ongoing and consistent use of antidepressants that would undermine Dr. Panzar's finding to the contrary. Accordingly, the Court finds that the prescription records do not undermine Liberty's finding that the record did not demonstrate ongoing antidepressant intervention.

Alternatively, the Court finds that – even if this record was overlooked and if it could be construed as undermining Dr. Panzar's finding that Plaintiff's records did not demonstrate ongoing antidepressant intervention – this single error does not render Dr. Panzar's overall conclusion to be unreliable. The Court finds that this Dr. Panzar's conclusion was based upon a variety of other findings relating to Plaintiff's diagnosis, impairments, and treatment. Accordingly, the Court finds that even if Dr. Panzar erred by overlooking Plaintiff's refill history at Walgreen's, this error is harmless and does not undercut his conclusion or Liberty's reliance on his conclusion.

Based upon the foregoing, the Court finds that Liberty's decision is supported by substantial evidence, and in sum, the Court finds that the decision is the "result of a deliberate, principled reasoning process and [] is supported by substantial evidence." See Glenn v. MetLife, 461 F.3d at 666. Accordingly, the Court cannot say that Liberty's review or its decision was arbitrary and capricious, and therefore, the Court finds that the decision should be upheld.

## V. CONCLUSION

Accordingly, the undersigned **RECOMMENDS**[5] that Plaintiff's Motion for Summary Judgment **[Doc. 33]** be **DENIED** and the Defendants' Motion for Judgment on the Administrative Record (ERISA) **[Doc. 31]** be **GRANTED**. Accordingly, the undersigned **RECOMMENDS** that Liberty's administrative decision that the Plaintiff was not entitled to long-term disability income benefits under the terms of the Dow Chemical Company Group Disability Income Policy be **AFFIRMED** and the Plaintiff's claims be **DISMISSED** with prejudice.

Respectfully Submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).